# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>    *Plaintiff,*<br><br><br>v.<br><br><br>XAVIER BECERRA, Secretary of the United States Department of Health and Human Services, in his official capacity; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and the UNITED STATES OF AMERICA,<br><br>    *Defendants.* | Civ. Action No. 3:22-cv-00419<br><br><br>**AMENDED COMPLAINT** |

## I.   INTRODUCTION

1.      In the closing days of the Obama Administration, the Department of Health and Human Services ("HHS") imposed a new rule regarding HHS awards under Title IV-E of the Social Security Act, 42 U.S.C. §§ 670–679b.  That rule (the "SOGI Rule") prohibits recipients from discriminating on the basis of "age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation" as well as same-sex marriage status.  *See* 45 C.F.R. § 75.300(c) – (d).  The SOGI Rule applies to the State of Texas, its Department of Family and Protective Services ("DFPS"), and child placing agencies within Texas through the administration of the its foster care system, which receives federal funding through HHS.

2.      In 2019, the State of Texas, DFPS, and the Archdiocese of Galveston-Houston (collectively, "the *Azar* Plaintiffs") challenged the SOGI Rule in this Court on the grounds that it violated the APA, the Religious Freedom Restoration Act ("RFRA"), the First Amendment, the Spending Clause, and the Nondelegation Doctrine. *See* ECF 1, Complaint, *Texas v. Azar*, No. 3:19-cv-00365 (S.D. Tex.) (Brown, J.).

3.      In response to that lawsuit, HHS moved for dismissal, arguing *inter alia* that the case was moot. ECF 22, *Azar*, No. 3:19-cv-00365. Specifically, HHS argued that the case was moot because (1) HHS never enforced the SOGI Rule; (2) HHS made it clear that it would not enforce it; and (3) HHS was attempting to revise it. *Id.* at 1–2.

4.      HHS relied on the facts that it had (1) published a notification of nonenforcement in the Federal Register (the "Notice of Nonenforcement");[1] (2) published a

---

[1] *See* Notification of Nonenforcement of Health and Human Services Grant Regulation, 84 Fed. Reg. 63,809, 63,811 (Nov. 19, 2019).

notice of proposed rulemaking to revise the SOGI Rule (the "NPR");[2] and (3) sent a letter to Texas informing it that "RFRA prohibits [the agency] from applying [the SOGI Rule] to the State of Texas" with respect to religious entities participating in programs funded by Title IV-E ("the "Texas Letter of Nonenforcement").[3]

5.     The *Azar* Plaintiffs countered that the case was not moot because the HHS's "revocable notice of temporary non-enforcement" and "'proposal' for a new regulation" did not alter existing federal law and would continue to violate a federal regulation. Indeed, the *Azar* Plaintiffs argued that the Defendants' "*non-binding* promise to *temporarily* halt enforcement of a rule *until* completing a rulemaking that only may displace parts of the rule" constitutes a "non-binding half-measure[]" that is "hardly enough to displace the existing (and illegal) federal law in place *right now*." ECF 37, Plaintiffs' Joint Opposition to Motion to Dismiss at 1, *Azar*, No. 3:19-cv-00365 (emphases in original).

6.     This Court recognized that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power," while acknowledging that courts must determine whether a defendant's actions actually extinguish the controversy or represent mere litigation posturing. *Texas v. Azar*, 476 F. Supp. 3d 570, 575 (S.D. Tex. 2020). And in the context of governmental defendants, the Court specifically noted that they are "accorded a

---

[2] *See* Notice of Proposed Rulemaking, Office of the Assistant Secretary for Financial Resources, Health and Human Services Grants Regulation, 84 Fed. Reg. 63,831 (proposed Nov. 19, 2019).

[3] HHS Office of Civil Rights, Letter Re: Application of 45 C.F.R. § 75.300(c) & (d) in Light of the Religious Freedom Restoration Act (March 5, 2020), available at https://web.archive.org/web/20211123195803/https://www.hhs.gov/sites/default/files/agency-action-ocr-letter-to-txas-re-rfra.pdf (last visited May 12, 2023).

presumption of good faith because they are public servants, not self-interested private parties." *Id.* (quoting *Moore v. Brown*, 868 F.3d 398, 407 (5th Cir. 2017)).

7. The Court explained that the voluntary cessation doctrine does not apply when "a government entity assures a court of continued compliance, and the court has no reason to doubt the assurance." *Id.* at 575–76 (quoting *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 572 (5th Cir. 2018)).

8. Granting this presumption of good faith to HHS based on its representations and actions, this Court determined that the agency "actually extinguished the controversy," making the case moot. *Id.* at 578 (alterations omitted) (citing *Moore*, 868 F.3d at 407). In reaching this conclusion, the Court relied on the three actions that HHS had undertaken. *Id.* at 576–78.

9. First, the Court relied on the Notice of Nonenforcement, which promised that HHS would not enforce the SOGI rule "pending repromulgation."[4] *Azar*, 476 F. Supp. 3d at 576.

10. Second, the Court relied on the NPR that was supposed to revise the challenged provisions in the SOGI Rule. *Id.*

11. And third, the Court relied on the Texas Letter of Nonenforcement, finding that such an explicit concession further supported the claim of mootness and was in line with Fifth Circuit precedent. *Id.* at 576–77.

---

[4] Notification of Nonenforcement of Health and Human Services Grant Regulation, 84 Fed. Reg. at 63,811 (Nov. 19, 2019).

12.     Ultimately, the Court noted the *Azar* Plaintiffs' warning that "HHS could start enforcing the challenged provisions at any time" if it were not repealed but determined that there was no reason to doubt HHS's assurances, taking HHS's assurances "as its word," *id.* at 578–79, and dismissed the case as moot, *id.* at 580.

13.     But as feared by the *Azar* Plaintiffs, HHS's assurances proved ephemeral. Indeed, HHS's own actions subsequent to the dismissal have undermined its assurances given to this Court.

14.     For starters, the NPR resulted in nothing. HHS did finalize the revisions to the SOGI Rule that it had proposed in the NPR at the end of the Trump Administration (the "2021 Final Rule"),[5] which would have repealed the SOGI Rule by removing any language regarding discrimination based on sexual orientation and gender identity.[6] And the 2021 Final Rule would have ultimately rendered the Notice of the Nonenforcement inapplicable and unnecessary because—once its effective date arrived—the 2021 Final Rule would rescind the SOGI Rule.

15.     But after the 2021 Final Rule was immediately challenged in a separate lawsuit in the U.S. District Court for the District of Columbia, *Facing Foster Care in Alaska v. HHS*, No. 21-cv-308-JMC (D.D.C.), *HHS itself* eventually moved that court to vacate the 2021 Final Rule that would have revised the SOGI Rule (after it had repeatedly acquiesced in it being stayed before it became effective). *See* ECF 41, Defs.' Mot. for Remand with Vacatur, *Facing Foster Care*, No., 21-cv-308-JMC (D.D.C.). With HHS's motion unopposed, the court vacated

---

[5] Health and Human Services Grants Regulation, 86 Fed. Reg. 2,257 (Jan. 12, 2021).
[6] 86 Fed. Reg. at 2,278.

the 2021 Final Rule. *See* ECF 44, June 29, 2022 Order, *Facing Foster Care*, 21-cv-308-JMC (D.D.C.). As a result, the 2021 Final Rule never became effective and the SOGI Rule was not repealed as HHS promised, undermining any assurance the NPR provided.

16.     Meanwhile, on November 18, 2021, HHS "rescinded" the exception from enforcement in the Texas Letter of Nonenforcement, stating that it was "overbroad."[7] At the same time, HHS issued a press release, stating that "HHS will not condone the blanket use of religious exemptions against any person or blank checks to allow discrimination against any persons, importantly including LGBTQ+ persons in taxpayer-funded programs."[8] And referencing the Texas Letter of Nonenforcement—among the other letters issued to some other states—the press release even stated that "[t]he waivers are inconsistent with the Department's critical goal of combating discrimination based on religion, sexual orientation, and gender identity."[9] This "critical goal" is in some tension with the fact that the SOGI Rule is the only basis for "combating" discrimination on those grounds in Title IV-E funding— and the effectiveness of which is supposed to be barred by the Notice of Nonenforcement.

17.     With the NPR and Texas Letter of Nonenforcement nullified by HHS, the only potential assurance remaining was the Notice of Nonenforcement, which only stated that the SOGI Rule would not be enforced "pending repromulgation." However, the Notice of

---

[7] HHS Office for Civil Rights, Letter Re: Withdrawal of Exception from Non-Discrimination Requirements of 45 CFR 75.300(c) & (d) (Nov. 18, 2021), available at https://www.hhs.gov/conscience/religious-freedom/state-letter-to-texas-withdrawing-exception-from-non-discrimination-requirements/index.html (last visited May 12, 2023).

[8] News Release, HHS, HHS Takes Action to Prevent Discrimination and Strengthen Civil Rights (Nov. 18, 2021), available at https://public3.pagefreezer.com/browse/HHS.gov/30-12-2021T15:27/https://www.hhs.gov/about/news/2021/11/18/hhs-takes-action-to-prevent-discrimination-and-strengthen-civil-rights.html (last visited May 12, 2023).

[9] *Id.*

Nonenforcement was rendered expired and ineffective once the repromulgation was no longer "pending."[10]

18.     Moreover, even if the Notice of Nonenforcement had not expired on its own terms, any assurance that it could give is now threatened in other litigation. Specifically, the plaintiffs in the Southern District of New York have challenged the Notice of Nonenforcement on the grounds that: (1) "'guts' the policy of non-discrimination from the [SOGI Rule];" (2) constitutes "a substantive, binding rule within the meaning of the APA," requiring notice-and-comment rulemaking; and (3) rises to the level of "arbitrary and capricious" decisionmaking. *See Family Equality v. Becerra*, No. 1:20-CV-2403 (MKV), 2022 WL 956256, at *1 (S.D.N.Y. Mar. 30, 2022).

19.     The Southern District of New York dismissed that case for lack of standing and thus did not address these arguments. *See id.* at *4–6. But the plaintiffs have appealed the district court's judgment to the U.S. Court of Appeals for the Second Circuit. *See* Brief for Plaintiffs-Appellants, *Family Equality v. Becerra*, No. 22-1174 (2d Cir. filed Aug. 26, 2022), 2022 WL 3911050. Thus, the Notice of Nonenforcement will remain vulnerable to litigation there and in other fora.

20.     Moreover, the Biden Administration has engaged in several other actions that cast significant doubt on the continued viability of the Notice of Nonenforcement.

---

[10] The "repromulgation" period referred to in the Notice of Nonenforcement is of the specific NPR issued on the same day as that Notice. *See* Notification of Nonenforcement of Health and Human Services Grant Regulation, 84 Fed. Reg. 63,809, 63,811 n.7 (Nov. 19, 2019) ("Elsewhere in this issue of the Federal Register, the Department publishes a notice of proposed rulemaking to begin the process of repromulgating, as appropriate, these rules."). Despite obtaining the vacatur of its own rule repealing the SOGI Rule (pursuant to that specific NPR), HHS has made no effort to further initiate any additional "repromulgation."

21.     On Inauguration Day, President Biden issued an executive order demanding every agency "review all existing orders, regulations, guidance documents, policies, programs, or other agency actions" that "are or may be inconsistent" with the order's policy "to prevent and combat discrimination on the basis of gender identity or sexual orientation."[11]

22.     HHS got the message. On March 2, 2022, the Children's Bureau in HHS's Administration for Children and Families ("ACF") published an Information Memorandum ("IM") that directed states and Title IV-E agencies to act  based on the legitimacy of the concepts of gender identity and sexual orientation.[12] This IM was allegedly designed to "offer[] guidance to title IV-B and title IV-E agencies when serving LGBTQI+ children and youth who are involved with the child welfare system," while also "encourag[ing] agencies to consider the many provisions in titles IV-B and IV-E of the Act that agencies can use to help guide their work with families at risk, and when creating case plans for LGBTQI+ children and youth in foster care."[13]

23.     Specifically, the IM explains that a child or youth's "case plan *must* include how the agency is working to improve the conditions in the family such as any underlying issues or conflicts with the child or youth's parents that impede reunification, including those that relate to the child or youth's sexual orientation or gender identity/expression."[14] This is a direct regulatory requirement on DFPS and other State agencies.

---

[11] Executive Order 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7,023 (Jan. 20, 2021).

[12] *See generally* U.S. Dep't of Health & Hum. Servs., Children's Bureau, IM-22-01, Guidance for Title IV-B and IV-E Agencies When Serving LGBTQI+ Children and Youth (March 2, 2021), available at https://www.acf.hhs.gov/sites/default/files/documents/cb/im2201.pdf (last visited May 12, 2023).

[13] *Id.* at p.2.

[14] *Id.* at p.7 (emphasis added).

24.     And the IM specifically sets forth HHS's position that agencies providing services under Title IV-E that do not these practices are acting contrary to the well-being of children:

> Too often, systemic barriers and practices are created to deny such children and youth gender affirming medical care, especially to transgender and gender nonconforming children and youth. The Children's Bureau does not support these barriers and practices, and *we are unequivocal that they are counter to children and youth's best interests*.[15]

25.     The IM also specifically directs "each title IV-E agency" to be "particularly vigilant about placing LGBTQI+ children and youth in homes and child-care institutions where they are supported, safe, and can develop as a whole person"[16]—and the IM makes clear that this does not include providers who do not "affirm" the concepts of sexual orientation or gender identity.[17]

26.     It further directs such agencies to "provide LGBTQI+ children and youth with opportunities to participate in activities that further support their identity, resilience, and development, including activities related to being LGBTQI+."[18]

27.     This IM even goes so far as to describe these directives as a "responsibility" of such agencies,[19] while also detailing that anti-discrimination regarding sexual orientation and

---

[15] *Id.* at p.10 (emphasis added).

[16] *Id.*

[17] *Id.* at p.2 ("For example, title IV-B and IV-E agencies must consider and address the needs of children and youth in their care as part of their case plan. This includes placing them in safe, permanent placements that support the whole of each child and youth's well-being. This also should include addressing needs that a child or youth may have as a result of their sexual orientation, gender identity, or gender expression.").

[18] *Id.* at p.11.

[19] *See id.* at p.10.

gender identity will be enforced through requiring DFPS and other State agencies to adopt these concepts in their submitted plans:

> The regulations at 45 C.F.R. § 1355.32(d) regarding partial reviews of title IV-E or IV-B plans allow ACF to conduct a partial review appropriate to the nature of the concern if ACF becomes aware of a title IV-B or IV-E compliance issue outside the scope of the Child and Family Services Review (CFSR). As part of the partial review, ACF will conduct an inquiry and require the title IV-E agency to submit additional data as may be necessary. If the inquiry demonstrates that the agency is not in compliance with its title IV-B or IV-E plan, the agency must enter into a program improvement plan (PIP) that is designed to bring the agency into compliance with its plan and relevant requirements. If, after the PIP process, the agency still fails to comply with the applicable requirements, the agency will be subject to a penalty related to the extent of the noncompliance. See 45 C.F.R. § 1355.32(d)(4). The partial review process applies to title IV-B and IV-E plan compliance issues that involve children and youth who are LGBTQI+.[20]

28.    In doing so, the IM directly contradicts the Notice of Nonenforcement by purports to apply extra-statutory anti-discrimination provisions on the bases of sexual orientation and gender identity—just as the SOGI Rule does.

29.    And any language in the IM that appears to be merely suggesting options for Title IV-E agencies in dealing with sexual orientation and gender identity must be read with the statement of HHS Secretary Xavier Becerra that it was released under—a statement attacking Texas by name for its refusal to allow sterilization and mutilation of children.[21] Describing the IM, Becerra stated that:

> HHS is releasing guidance to state child welfare agencies through an Information Memorandum that makes clear that states should use their child

---

[20] *Id.*

[21] Press Release, Statement by HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth (Mar. 2, 2022), available at https://www.hhs.gov/about/news/2022/03/02/statement-hhs-secretary-xavier-becerra-reaffirming-hhs-support-and-protection-for-lgbtqi-children-and-youth.html (accessed May 12, 2023).

welfare systems to advance safety and support for LGBTQI+ youth, which importantly can include access to gender affirming care.[22]

30.     The IM is part of a broader directive by the Biden Administration undercutting the Notice of Nonenforcement.

31.     On June 15, 2022, President Biden issued another executive order, titled "Barriers Faced by LGBTQI+ Children, Youth, Parents, Caretakers, and Families in the Child Welfare System and Juvenile Justice Systems."[23] President Biden ordered HHS to "consider how to use the Department's authorities to strengthen non-discrimination protections on the basis of sex, including sexual orientation, gender identity, and sex characteristics, in its programs and services."[24]

32.     HHS was further ordered to "to establish an initiative to partner with State child welfare agencies to help address and eliminate disparities in the child welfare system experienced by LGBTQI+ children, parents, and caregivers."[25] This "initiative" was supposed to address a number of alleged "disparities" in the child welfare system, including (1) "the over-representation of LGBTQI+ youth in the child welfare system, including over-representation in congregate placements;" (2) "disproportionately high rates of abuse, and placements in unsupportive or hostile environments faced by LGBTQI+ youth in foster care;" (3) "disproportionately high rates of homelessness faced by LGBTQI+ youth who exit foster

---

[22] *Id.*
[23] Executive Order 14,075 of June 15, 2022, Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals, §§ 1, 5, 87 Fed. Reg. 37,189, 37,189, 37,191 (June 21, 2022).
[24] 87 Fed. Reg. at 37,191.
[25] *Id.*

care;" and (4) "discrimination faced by LGBTQI+ parents, kin, and foster and adoptive families."[26]

33.     Under this executive order, "[t]he Federal Government *must* take action to address the significant disparities that LGBTQI+ youth face in the foster care system, the misuse of State and local child welfare agencies to target LGBTQI+ youth and families, and the mental health needs of LGBTQI+ youth."[27]

34.     And while this executive order references HHS's "authorities to strengthen non-discrimination provisions," there are no such authorities relating to sexual orientation or gender identity in federal foster care funding under Title IV-E. Thus, President Biden's declaration that the government "must take action" flies in the face of any guarantee in the Notice of Nonenforcement.

35.     HHS's Children's Bureau issued a document (the "Advancing Equity Directive") addressing the "Child and Family Services Reviews (CFSRs) [which] are designed to determine states' compliance with titles IV-B and IV-E of the Social Security Act, and to evaluate child welfare system performance and require states to make improvement in outcomes for children and families required,"[28] and tied those reporting requirements to "people who identify as LGBTQ+."[29] Tellingly, the same reporting requirements discuss "lead[ing] with an equity focus" when "determin[ing] states' compliance with titles IV-B and

---

[26] *Id.*

[27] *Id.* at 37,189 (emphasis added).

[28] Children's Bureau, Advancing Equity and Inclusion Through the Child and Family Services Reviews at 1, available at https://www.cfsrportal.acf.hhs.gov/document/download/rpPxGN (last visited May 12, 2023).

[29] *Id.*

IV-E of the Social Security Act," and it then defines "equity" to include "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons."[30]

36.     Likewise, when the Children's Bureau recently issued instructions to state agencies that administer or supervise the administration of Title IV-B and Title IV-E funds (the "Program Instruction"),[31] it referred to President Biden's executive orders—including those related to gender identity and sexual orientation—as "a challenge and framework to thoughtfully identify and address opportunities to advance equity in child welfare policy and practice.[32] And immediately after referencing those executive orders, this program instruction then "ask[s] grantees to take steps to better understand and address inequities … and pay specific attention to opportunity for advancing equity within the populations they serve."[33]

37.     Thus, the language in the IM, the Program Instruction, and the Advancing Equity Directive (collectively, the "Becerra Actions") further detract from any guarantee in the Notice of Nonenforcement because it suggests that such nondiscrimination provisions are already being considered and subject to enforcement when determining a State's compliance with Title IV-E.

38.     Overall, even were the Notice of Nonenforcement to remain in effect, this Court declined to rely on it in isolation to support dismissal, instead explaining that "[t]o the extent that one of HHS's statements of nonenforcement does not do away with the plaintiffs'

---

[30] *Id.* at 1–2.

[31] "The purpose of this Program Instruction is to: (1) set forth the requirements for recipients of Community-Based Grants for the Prevention of Child Abuse and Neglect awards for FY 2023; and (2) provide guidance and instructions for the preparation and submission of the application and annual reports." *Id.* at 1

[32] *See* Children's Bureau, ACYF-CB-PI-23-05, Program Instruction (Feb. 27, 2023) at 1, 4 available at https://www.acf.hhs.gov/sites/default/files/documents/cb/pi2305.pdf (last visited May 12, 2023).

[33] *Id.* at 4.

concerns, the other covers up its sins." *Azar*, 476 F. Supp. 3d at 577. As this situation of mutually reinforcing actions no longer exists, the case is no longer moot and Texas has standing.

39.     And even were the Notice of Nonenforcement to remain in effect, any such assurance would not account for the existing and underlying agency practice that allegedly predated the SOGI Rule and must serve as the basis for actions such as the Becerra Actions. In fact, the SOGI Rule itself mentions that "[t]his final rule … codifies long-standing policies."[34] The Becerra Actions are either (1) instances of HHS continued to implement the SOGI Rule despite the Notice of Nonenforcement—as there is no other statutory or regulatory basis for an anti-discrimination requirements for sexual orientation or gender identity in Title IV-E funds—or (2) instances of a policy that exists apart from the SOGI Rule and is therefore immune from the application of the Notice of Nonenforcement.

40.     After all, the Notice of Proposed Rulemaking that led to the SOGI Rule made explicit that HHS was applying such an anti-discrimination requirement even without adoption of the SOGI Rule:

> HHS proposes two changes to 45 CFR 75.300. First, HHS is codifying a prohibition in the provision of services of discrimination on the basis of age, disability, sex, race, color, national origin, religion, sexual orientation, or gender identity. This provision codifies for all HHS service grants what is already applicable for all HHS service contracts, as required by the HHS Acquisition Regulation (HHSAR) 352.237-74. The HHSAR provision makes explicit HHS's non-discrimination policy when obligating appropriations for solicitations, contracts and orders that deliver service under HHS's programs directly to the public. In order to ensure that this same provision applies equally to grants, HHS proposes an addition to make this explicit in the grants context.[35]

---

[34] Health and Human Services Grants Regulation, 81 Fed. Reg. 89,393, 89,394 (Dec. 12, 2016).
[35] Notice of Proposed Rulemaking, Health and Human Services Grants Regulation, 81 Fed. Reg.

41.     As a result, if the SOGI Rule merely codifies "long-standing" agency policy, then the Notice of Nonenforcement—which is limited by its terms to the SOGI Rule—does not apply to the "long-standing" agency practices and actions that inspired the SOGI Rule, meaning that HHS has been implementing unlawful nondiscrimination provisions for quite some time. Therefore, the existing underlying agency practice that inspired the SOGI Rule remains essentially unaffected by the Notice of Nonenforcement.

42.     Accordingly, the same assurances by HHS that provided the underpinnings for this Court's dismissal in *Azar* no longer control.

43.     Given this change in circumstances, Texas files this lawsuit to defend the interests of the State, DFPS, and the vulnerable children in its care.

44.     Texas and DFPS serve all foster children and are willing to work with all potential foster parents.

45.     But to better help foster children, DFPS partners with numerous and diverse child placing agencies. Some of those agencies have sincerely held religious beliefs that would prevent them from following the SOGI Rule or the Becerra Actions. Texas and its children benefit greatly from the work done by those child placing agencies. But because the SOGI Rule and the Becerra Actions forbid Texas and DFPS from working with these agencies, Texas will lose the benefit of working with a greater number of child placing agencies, and foster children will suffer.

---

45,270, 45,271 (July 13, 2016).

46.     And because the SOGI Rule and the Becerra Actions prohibit Texas from working with child placing agencies that object to concepts of sexual orientation and gender identity, Texas and DFPS will have to either forgo federal funding or cease working with those agencies. In either case, Texas—but more importantly, Texas's foster children—will be harmed.

47.     The Court should also set aside (*i.e.*, vacate) the SOGI Rule and the Becerra Actions as unlawful, and declare that there is no lawful basis for an anti-discrimination requirement regarding sexual orientation or gender identity in the use of Title IV-E funds. Applied to Texas and child placing agencies in Texas, both the SOGI Rule and the Becerra Actions violate the Administrative Procedure Act.

48.     HHS is required by statute to fund state plans that satisfy the statutory criteria set by Congress. But in the SOGI Rule and the Becerra Actions, HHS claimed the power to deny federal funding based on criteria not found in the statute. Moreover, the SOGI Rule and the Becerra Actions are inconsistent with the carefully crafted—and more limited—anti-discrimination rules that Congress specifically designed to govern the conduct of programs funded by Title IV-E of the Social Security Act, 42 U.S.C. §§ 670-679c.

49.     In addition, HHS promulgated the SOGI Rule under 5 U.S.C. § 301, a federal housekeeping statute that does not authorize substantive regulations like the SOGI Rule.

50.     Even if HHS otherwise had the power to promulgate the SOGI Rule or issue the Becerra Actions, it would still be unlawful because HHS acted arbitrarily and capriciously. HHS exempted Title IV-A funds from the SOGI Rule because Title IV-A contains a statutory

anti-discrimination provision.  But HHS did not exempt Title IV-E, which governs foster care, even though it also contains a statutory anti-discrimination provision.  HHS did not recognize, much less explain, this apparent inconsistency.

51.     Moreover, HHS failed to consider either the best interests of foster children or the religious-liberty interests of child placing agencies.  No rule governing foster care should be enacted without careful analysis of whether it will help or hurt foster children.  And no rule burdening the ability of religious individuals and organizations to live out their faith should be enacted without serious examination of the religious-liberty implications.  By failing to even consider those factors, HHS acted arbitrarily and capriciously.

## II.   PARTIES

*52.*     Plaintiff the State of Texas is a free and independent State, subject only to the Constitution of the United States.  Tex. Const. art. I, § 1.  Texas has the authority and responsibility to protect the health, safety, and welfare of its residents.  *See, e.g., Texas v. Richards*, 301 S.W.2d 597, 602 (Tex. 1957) ("As a general rule the [police] power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience"); *Lombardo v. City of Dallas*, 73 S.W.2d 475, 479 (Tex. 1934) ("[T]he police power of a state embraces regulations designed to  promote the public health, the public morals, or the public safety.").  This includes the authority to protect and, when necessary, care for the children of Texas.  *See* Tex. Fam. Code § 262.001 *et seq.*

53.     Defendants are an appointed official of the United States government, a United States governmental agency responsible for the issuance and implementation of the challenged regulation, and the United States.

54.     Defendant Xavier Becerra is the Secretary of the United States Department of Health and Human Services.  He is sued in his official capacity only.

55.     Defendant HHS is the agency that promulgated and now enforces the challenged regulation.

56.     Defendant the United States of America is sued under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

## III.  JURISDICTION AND VENUE

57.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 702–703.

58.     The Court is authorized to award the requested declaratory relief under 5 U.S.C. § 706 and 28 U.S.C. §§§ 2201–2202.

59.     The Court is authorized to award injunctive relief under 28 U.S.C. § 1361.

60.     Venue lies in this district pursuant to 28 U.S.C. § 1391.

## IV.  FACTUAL BACKGROUND

### A. Foster Care in Texas

61.     DFPS administers Texas's foster care system to care for children who cannot live safely at home.

62.     When a child in Texas is in that situation, DFPS tries to identify relatives or friends who are willing and able to care for that child.

63.     If DFPS cannot find an appropriate relative or friend, however, the child will be placed in foster care.  A child in foster care might live in a foster family home, a foster family group home, a residential group care facility, or a facility overseen by another state agency.

64.     DFPS spends approximately $550 million per year on residential childcare as part of Texas's foster care system. Almost 23 percent of that money is federally funded pursuant to Title IV-E. In addition, DFPS receives approximately $58 million per year in Title IV-E funding to support casework services for children in foster care.

65.     Foster care has been changing in Texas.  DFPS has been transitioning from a legacy system to a new Community-Based Care ("CBC") system.

66.     In the legacy system, DFPS contracted directly with child placing agencies, which often found homes for children in foster care.

67.     But in the new CBC system, DFPS contracts with a Single Source Continuum Contractor ("SSCC") in each of several geographic service areas.  The SSCC is responsible for finding foster homes or other living arrangements for foster children in its geographic service area.

68.     An SSCC will often rely on child placing agencies to find homes for children in its area.

69.     Properly addressing foster care in Texas requires the help of many child placing agencies.  Having a diverse network of child placing agencies helps DFPS fulfill its foster care mission.

70.     Texas has taken steps to ensure it can contract with many different child placing agencies which hold varying views on religion, sexual orientation, gender identity, and same-sex marriage status.  DFPS works with both secular and faith- based organizations  to find loving homes for children.

71.     One such step was passing H.B. 3859, which is codified in Chapter 45 of the Texas Human Resources Code.  H.B. 3859, which was enacted in 2017, explains:

> It is the intent of the legislature to maintain a diverse network of service providers that offer a range of foster capacity options and that accommodate children from various cultural backgrounds.  To that end, the legislature expects reasonable accommodations to be made by the state to allow people of diverse backgrounds and beliefs to be a part of meeting the needs of children in the child welfare system.

Tex. Hum. Res. Code § 45.001.

72.     H.B. 3859 furthers the Legislature's intent by ensuring that more child welfare service providers, including child placing agencies, can operate in Texas:

> A governmental entity or any person that contracts with this state or operates under governmental authority to refer or place children for child welfare services may not discriminate or take any adverse action against a child welfare services provider on the basis, wholly or partly, that the provider: (1)  has declined or will decline to provide, facilitate, or refer a person for child welfare services that conflict with, or under circumstances that conflict with, the provider's sincerely held religious beliefs; …

Tex. Hum. Res. Code § 45.004.

73.     By increasing participation, H.B. 3859 furthers the best interests of foster children in Texas.

74.     H.B. 3859 also ensures that those individuals who do not want to, or cannot, work with religious child placing agencies have other options.  "A child welfare services

provider who declines to provide a child welfare service as authorized by" H.B. 3859 is obligated to provide the person seeking the service with information about other service providers. Tex. Hum. Res. Code § 45.005(c).

75.     This is consistent with Defendants' encouragement of "the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State for whom foster and adoptive homes are needed." 42 U.S.C. § 622(b)(7); *see also* 45 C.F.R. § 1355.34(b)(2)(ii)(C).

76.     Elsewhere in the Code of Federal Regulations, HHS explains that

> Faith-based or religious organizations are eligible, on the same basis as any other organization, to participate in any HHS awarding agency program for which they are otherwise eligible. Neither the HHS awarding agency, nor any State or local government and other pass-through entity receiving funds under any HHS awarding agency program shall, in the selection of service providers, discriminate for or against an organization on the basis of the organization's religious character or affiliation.

45 C.F.R. § 87.3(a). Faith-based or religious organizations are similarly eligible for DFPS programs.

77.     A number of faith-based providers receive Title IV-E funding through DFPS to provide their services. Some of these providers require potential foster care or adoptive parents to share a religious faith or agree to the provider's statement of faith. Some have particular religious views on marriage, gender identity, and sexual orientation. But none of them

21

should be required to forfeit their beliefs as a condition of helping Texas's most vulnerable children.[36]

78.     Nonetheless, the SOGI and the Becerra Actions require Texas to refrain from working with these faith-based organizations, while also requiring these organization to abandon their core religious beliefs as a condition of receiving Title IV-E funding, contrary to Texas law. This injures Texas's interest in implementing a legal code.

### B. Federal Funding for Foster Care

79.     Federal funding for foster care is governed by Title IV-E of the Social Security Act, which is codified at 42 U.S.C. §§ 670–679c.  Title IV-E provides grants to States for foster care, transitional independent living programs, adoption assistance, and kinship guardianship assistance, among other things.   42 U.S.C. § 670.  Title IV-E operates through "the conditional grant of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

80.     HHS administers Title IV-E at the federal level.  DFPS administers Title IV-E grants at the State level.

81.     To be eligible for payment under Title IV-E, a State must submit a plan for approval by the Secretary of HHS. *See* 42 U.S.C. § 671(a).

82.     Title IV-E lists requirements for State plans in 42 U.S.C. § 671(a).

---

36     A list of these providers is located on the DFPS website. *See* http://www.dfps.state.tx.us/Adoption_and_Foster_Care/Adoption_Partners/private.asp (last visited May 12, 2023). The particular requirements of each provider may be determined by clicking on a provider's name and accessing that provider's website.

83.     The Secretary must approve any State plan that complies with section 671(a). The Secretary does not have discretion to deny approval of any State plan that complies with § 671(a).  *Id.* § 671(b) ("The Secretary shall approve any plan which complies with the provisions of subsection (a) of this section."); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007) (explaining that a statutory directive that an agency "shall approve" a state submission upon certain conditions "is mandatory" if the conditions are met and there is no contrary statute); *Luminant Generation Co. v. EPA*, 675 F.3d 917, 926 (5th Cir. 2012).

84.     HHS must make payments to States with approved plans.  HHS does not have discretion to deny payments to States with approved plans.  *See* 42 U.S.C. § 674(a) ("For each quarter beginning after September 30, 1980, each State which has a plan approved under this part shall be entitled to a payment").

85.     Under this system, Congress can create incentives for States by adjusting the plan requirements in section 671(a).  At the same time, Congress limits the Secretary's ability to create incentives for States by requiring the Secretary to approve plans and make payments when a State satisfies section 671(a).

## C. Statutory Anti-Discrimination Requirements in Title IV-E of the Social Security Act

86.     Title IV-E contains an express anti-discrimination provision.  It requires State plans to prohibit discrimination on the basis of "race, color, or national origin":

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which— … (18) not later than January 1, 1997, provides that neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may—(A) deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of

the person, or of the child, involved; or (B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.

42 U.S.C. § 671(a).

87.     Title IV-E also contains an express anti-discrimination provision concerning out-of-jurisdiction adoptions:

In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which— … (23) provides that the State shall not—(A) deny or delay the placement of a child for adoption when an approved family is available outside of the jurisdiction with responsibility for handling the case of the child.

42 U.S.C. § 671(a)(23).

88.     The scope of Title IV-E's anti-discrimination provisions reflects Congress's deliberate choice.  It differs from a similar anti-discrimination provision in Title IV-A, which prohibits different kinds of discrimination, including age and disability discrimination.  42 U.S.C. § 608(d); *see also* 42 U.S.C. § 603(a)(5)(I)(iii) (prohibiting sex discrimination in some contexts).

89.     To enforce Title IV-E's anti-discrimination provisions, Congress created a detailed remedial scheme.  42 U.S.C. § 674(d).

90.     When a State violates the statutory anti-discrimination requirements, HHS reduces the State's funding for that fiscal quarter.  That funding is reduced by amounts that vary from 2 percent to 5 percent, depending on the number of violations in that fiscal year.  *Id.* § 674(d)(1)(A)–(C).  This provision reflects Congress's determination about the appropriate incentives to give States.  *Cf. Dole*, 483 U.S. at 211 (finding conditional spending legislation not

coercive because "all [the State] would lose … is 5% of the funds otherwise obtainable under specified highway grant programs").

91.     A non-State entity that violates the statutory anti-discrimination requirements must return all of the state funding it received that quarter.  42 U.S.C. § 674(d)(2).

92.     Both States and non-State entities can face private lawsuits from individuals "aggrieved by a violation of" the statutory anti-discrimination provision concerning race, color, or national origin.  42 U.S.C. § 674(d)(3).

93.     The scope of these enforcement provisions reflects Congress's deliberate choice. Congress could have chosen to enforce anti-discrimination requirements in a different way, but it did not.

## D. Adoption of the SOGI Rule

94.     On July 13, 2016, HHS proposed the SOGI Rule, which would add regulatory anti-discrimination requirements on top of those Congress has provided by statute.  81 Fed. Reg. 45,270.

95.     Specifically, HHS proposed to add two new paragraphs to 45 C.F.R. section 75.300:

> (c) It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation. Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards.
>
> (d) In accordance with the Supreme Court decisions in *United States v. Windsor* and in *Obergefell v. Hodges*, all recipients must treat as valid the marriages of same-sex couples.  This does not apply to registered

domestic partnerships, civil unions or similar formal relationships recognized under state law as something other than a marriage.

96.    HHS claimed that these changes were "based on existing law or HHS policy" even though they "were not previously codified in regulation." 81 Fed. Reg. 45,270.  HHS professed a belief that the changes were "non-controversial." 81 Fed. Reg. 45,271.

97.    The SOGI Rule was published as final on December 12, 2016.  81 Fed. Reg. 89,393.  It remains in effect today.

98.    The SOGI Rule does not contain any exception for religiously motivated individuals or entities.

99.    In promulgating the SOGI Rule, HHS relied on only one statute for authority: 5 U.S.C. § 301.  *See* 81 Fed. Reg. 89,395 ("The authority citation for 45 CFR part 75 continues to read as follows: Authority: 5 U.S.C. 301."); 81 Fed. Reg. 45,272 (same).

100.    Section 301 provides:

The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

5 U.S.C. § 301.

101.    The Supreme Court has called section 301 a "housekeeping statute" because it authorizes agencies "to regulate [their] own affairs." *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979).

102.    The Housekeeping Statute applies to many different federal agencies. It "is not a statute that [HHS] is charged with administering."  *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997); *see also Collins v. NTSB*, 351 F.3d 1246, 1253 (D.C. Cir. 2003) ("For generic statutes like the APA, FOIA, and FACA, the broadly sprawling applicability undermines any basis for deference, and courts must therefore review interpretative questions de novo.").

103.    HHS did not propose to apply the SOGI Rule to the Temporary Assistance for Needy Families Program ("TANF"), a program governed by Title IV-A. HHS noted that "[t]he TANF statute, 42 U.S.C. 608(d), already identifies the nondiscrimination provisions that can be applied to TANF." 81 Fed. Reg. 45,271.  The TANF statute specifies that "any program or activity which receives [TANF] funds" must comply with specified federal anti-discrimination statutes.  42 U.S.C. § 608(d). Those statutes prohibit discrimination on the basis of race, color, national origin, age, and disability.  They do not prohibit other types of discrimination covered by the SOGI Rule.

**E. The SOGI Rule Expressly Applies to Texas.**

104.    Generally, "[t]he terms and conditions of Federal-awards … flow down to subawards to subrecipients unless a particular section of this part or the terms and conditions of the Federal award specifically indicate otherwise," meaning "that non–Federal entities must comply with requirements in this part regardless of whether the non–Federal entity is a recipient or subrecipient of a Federal award." 45 C.F.R. § 75.101(b)(1).

105.    Specifically, the SOGI Rule (by its express terms) applies to "[r]ecipients," because it states that "[r]recipients must comply with this public policy requirement in the administration of programs supported by HHS awards."  45 C.F.R. § 75.300(c).  "Recipient"

is then defined as "an entity, usually but not limited to non–Federal entities, that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program." 45 C.F.R. § 75.2

106.   Under this framework, Texas qualifies a recipient because it is a non-Federal entity that directly receives federal funds from HHS to carry out Texas's foster care system.

## F. The SOGI Rule Also Regulates Child Placing Agencies, Even Though Its Terms Do Not Expressly Apply to Them.

107.   Notably, while the SOGI Rule only explicitly mentions "[r]ecipients," it does not mention subrecipients or sub-grantees. In fact, the definition of "[r]ecipient" specifically excludes "subrecipients." 45 C.F.R. § 75.2. (defining "recipients" to exclude "subrecipients").

108.   Further, the SOGI Rule does not apply to "[p]rocurement contracts." *See* 45 C.F.R. § 75.101(b)(1) (table) (showing "Subparts C–D, except for §§ 75.202, 75.303, 75.351-.353" "[a]re NOT applicable to" "[p]rocurement contracts").

109.   This is important because, in the legacy system, DFPS uses procurement contracts to procure the services of child placing agencies.

110.   DFPS's use of procurement contracts is consistent with 45 C.F.R. § 75.201(a): "The HHS awarding agency or pass-through entity must decide on the appropriate instrument for the Federal award (*i.e.*, grant agreement, cooperative agreement, or contract) in accordance with the Federal Grant and Cooperative Agreement Act (31 U.S.C. § 6301–08)."

111.   The Federal Grant and Cooperative Agreement Act requires federal executive agencies to

use a procurement contract as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—(1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or (2) the agency decides in a specific instance that the use of a procurement contract is appropriate.

31 U.S.C. § 6303.

112.    The principal purpose of the procurement contracts between DFPS and child placing agencies is for DFPS to acquire the services of those agencies for DFPS's direct benefit or use.  DFPS partners with child placing agencies to provide care and services to children in need.  DFPS views the children in its care as the beneficiaries of its services.  To that end, its funding is understood to benefit them.

113.    In the new CBC system, DFPS issues a sub-award to CBCs, and CBCs use procurement contracts to procure the services of child placing agencies.

114.    For Texas, the principal purpose of the procurement contracts between CBCs and child placing agencies is to acquire the services of those agencies for DFPS's and the CBCs' direct benefit or use.  That allows DFPS and the CBCs to better serve children in foster care.

115.    DFPS and the CBCs decided that a procurement contract is an appropriate instrument for reflecting their relationship with child placing agencies.

116.    In neither the legacy system nor the CBC system would the use of grant agreements or cooperative agreements be required to reflect the status of child placing agencies.  The principal purpose of the relationship with child placing agencies is not "to transfer a thing of value to the [child placing agencies] to carry out a public purpose of support or stimulation"; it is to "acquir[e] … property or services." 31 U.S.C. §§ 6304(1), 6305(1).

117.    The SOGI Rule further applies to all entities involved in the administration of HHS's Title IV-E Funds, including child placing agencies. After all, neither HHS nor other federal courts have disputed the fact that the SOGI Rule regulates and applies to faith-based organizations. *See e.g.*, *Holston United Methodist Home for Child., Inc. v. Becerra*, No. 2:21-CV-185, 2022 WL 17084226, at *7 (E.D. Tenn. Nov. 18, 2022) (concluding that the SOGI Rule applied to a faith-based child placement agency because the child placement agency's refusal to place children with same-sex couples or families "plainly discriminate[s] on the basis of sexual orientation and religion").

### G. The Becerra Actions Constitute Final Agency Action.

118.    Based on the many actions taken by the Biden Administration and HHS, the Becerra Actions rise to the level of final agency action because they represent the consummation of HHS's decision-making process, determine the rights and obligations of applicable entities, and create legal consequences.

119.    Generally, the APA only allows judicial review of a "final agency action." 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up).

120.    Here, the Becerra Actions satisfy both prongs of the finality requirement. *First*, the Becerra Actions are the consummation of HHS's decision-making process (and not a merely tentative or interlocutory action) because they express the definitive, decisive view of HHS regarding sexual orientation and gender identity in foster care which is "not subject to further [a]gency review." *See Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 853–54 (5th Cir. 2022) (quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012)). They thus represent the culmination of the decision-making process of HHS, and not an "informal" decision by "only a subordinate official." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018),

121.    Likewise, the Becerra Actions are not subject to further agency review because they contain no indication that HHS will engage in further research or findings regarding its views on gender identity or sexual orientation, and do not even discuss that Title IV-E's non-discrimination provisions are only limited to the statutory bases of race, color, and national origin. Instead, the Becerra Actions seem to advance what HHS believes is "the *only permissible* interpretation of the statute" at issue. *California Communities Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019) (determining that an agency memorandum satisfied the first prong of finality when it represented what the agency believed to be the only permissible interpretation rather than a mere reasonable interpretation).

122.    The Becerra Actions each constitute final agency action; collectively, they reinforce this determination because "[f]inal agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (cleaned up). "Hence, a preamble plus a guidance plus an

enforcement letter from [an agency] could crystallize an agency position into final agency action." *Id.*; *see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 n.8 (D.C. Cir. 1986) (final agency action consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official clarifying the agency's position).

123.    HHS has engaged in such a series of agency pronouncements—the Becerra Actions—that rise to the level of final agency action. In fact, as described above, the Biden Administration and HHS have gradually become bolder with the certainty of its pronouncements and actions regarding sexual orientation and gender identity, thus solidifying its views and position on the matter. And by declaring its now-settled position, it would be inapposite to then claim a lack of finality. Indeed, "[s]uch an approach would flout the Supreme Court's repeated instruction to approach finality flexibly and pragmatically." *EEOC*, 933 F.3d at 445 (citations omitted).

124.    *Second*, the Becerra Actions purport to determine the rights and obligations of Title IV-E agencies, such as child placing agencies in Texas, and it purports to specify the legal consequences that flow from non-compliance with such rights or obligations. They do so by (1) requiring a child or youth's case plan to include the agency's plan to improve issues or conflicts with a family that may prevent reunification, including a "child or youth's sexual orientation or gender identity/expression;" (2) instructing Title IV-E agencies to be "particularly vigilant about placing LGBTQI+ children and youth in homes and child-care institutions where they are supported, safe, and can develop as a whole person;" (3) directing Title IV-E agencies to "provide LGBTQI+ children and youth with opportunities to participate in activities that further support their identity, resilience, and development,

including activities related to being LGBTQI+," without even discussing an exception for those with contrary religious beliefs; and (4) then describing such instructions as a "responsibility" that are subject to enforcement from ACF and even complainants.[37]

125.    The Becerra Actions constitute final and reviewable agency action under the APA because HHS staff will evaluate Title IV-E plans based on their requirements—they "bind" HHS and its employees "to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive rule—really any rule—and a general statement of policy … turns on whether an agency intends to bind itself to a particular legal position."); *accord Texas v. United States (DAPA)*, 809 F.3d 134, 171 (5th Cir. 2015) ("We focus primarily on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up). Action "bind[ing]" an "agenc[y]" to a legal view "gives rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (citation omitted).

126.    In this case, the Becerra Actions did not merely "remind parties of existing statutory or regulatory duties" but rather imposed new duties and "chang[ed] the text" of the statute it "profess[ed] to interpret." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020); *Texas v. EEOC*, 827 F.3d 372, 385–86 (5th Cir. 2016), *opinion withdrawn on reh'g,* 838 F.3d 511 (5th Cir. 2016) ("[T]he [EEOC] Guidance does not simply repeat the relevant provisions of Title VII. Instead, the Guidance purports to interpret authoritatively

---

[37] *See* U.S. Dep't of Health & Hum. Servs., Children's Bureau, IM-22-01, Guidance for Title IV-B and IV-E Agencies When Serving LGBTQI+ Children and Youth (March 2, 2021), available at https://www.acf.hhs.gov/sites/default/files/documents/cb/im2201.pdf (last visited May 12, 2023).

[requirements of Title VII]. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA.").

127.    As explained throughout this Amended Complaint, Title IV-E's non-discrimination requirement is statutorily limited to race, color, and national origin. Entirely absent from that list is any mention—much less, any requirement—regarding gender identity and sexual orientation. Thus, the Becerra Actions impose new requirements on Texas, DFPS, and Texas's child placing agencies, thereby becoming a "legislative rule," which is, "by definition, final agency action." *EEOC*, 933 F.3d at 441.

### H. Texas Has Standing to Challenge the SOGI Rule and the Becerra Actions.

128.    Because the SOGI Rule and the Becerra Actions prohibit Texas from working with child placing agencies that determine the placement of children based on their religious beliefs about the concepts of sexual orientation and gender identity, Texas will suffer concrete injuries that are traceable to the both the SOGI Rule and the IM, and an injunction against both will redress those injuries. Texas thus has a "personal stake" in the outcome of this litigation. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

129.    Indeed, Texas faces a serious threat that the SOGI Rule and the Becerra Actions will be enforced against it. As a result, Texas's intended future conduct is "*arguably* … proscribed by [the policy in question]." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162–64 (2014)) (emphasis added; alterations in original).

130.     The existence of the SOGI Rule and the Becerra Actions both imply a threat of enforcement.  *See Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) ("The existence of the statute constitutes the government's commitment to prosecute in accordance with it and, thus, a concrete prospect of future harm for one who would flout it.").

131.     The federal government publishes guidance regarding the audit procedures applicable to Title IV-E programs. In a section entitled "Compliance Requirements," it provides: "Both States and tribes are subject to the requirements of 2 CFR part 200, subpart E, as implemented by HHS at 45 CFR part 75."[38] As a result, HHS will consider compliance with Part 75 during future audits.  The SOGI Rule is contained in Part 75.  *See* 45 C.F.R. § 75.300.

132.     Indeed, because Texas allows faith-based organizations to uphold their religious beliefs on sexual orientation or gender identity, it now risks reduced or eliminated Title IV-E funding.  *See* 45 C.F.R. § 75.371 (listing remedies for non-compliance with "the terms and conditions of a Federal award"); *see also id.* § 75.300(a) ("The Federal awarding agency must communicate to the non-Federal entity all relevant public policy requirements, including those in general appropriations provisions, and incorporate them either directly or by reference in the terms and conditions of the Federal award."); *id.* § 75.210(b)(1) ("HHS awarding agencies must incorporate the following general terms and conditions either in the Federal award or by reference, as applicable: … (ii) National policy requirements.").

---

[38] Office of Management and Budget, 2 CFR Part 200, Appendix XI Compliance Supplement, at 4-93.658-7 (April 2022), available at https://www.whitehouse.gov/wp-content/uploads/2022/05/2022-Compliance-Supplement_PDF_Rev_05.11.22.pdf (last visited May 12, 2023).

133.     Moreover, the SOGI Rule and the Becerra Actions deter some child placing agencies from working with DFPS.[39]  As a result, there are fewer child placing agencies serving children in foster care.  That harms both foster children and Texas.

134.     Therefore, Texas has standing to challenge the SOGI Rule and the Becerra Actions based on the direct injury they impose. After all, a threatened loss of federal funds is sufficient injury to satisfy Article III. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

135.     But Texas already suffers injury due to compliance costs. Staff time and resources are being incurred to determine whether DFPS's programs are in compliance with sexual orientation and gender identity anti-discrimination requirements imposed by the SOGI Rule and the Becerra Actions. "The imposition of regulatory burdens on State Plaintiffs is sufficient to demonstrate an injury to their sovereign interest in creating and enforcing a legal code to govern child custody proceedings ...." *Brackeen v. Haaland*, 994 F.3d 249, 297 (5th Cir. 2021) (en banc), *cert. granted,* 142 S. Ct. 1205 (Feb. 28, 2022). Indeed, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Restaurant Law Ctr. v. United States Dep't of Lab.*, —F.4th—, No. 22-50145, 2023 WL 3139900, at *2 (5th Cir. Apr. 28, 2023) (citations omitted); *see also Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("[C]omplying with a regulation later held invalid almost *always* produces the

---

[39] One potential provider familiar to the Court remains so deterred: "The Archdiocese of Galveston-Houston wants to create a program for sponsoring foster-care services in partnership with the State of Texas. But it contends that a 2016 Department of Health and Human Services' regulation governing child-welfare funding forecloses that opportunity; its nondiscrimination provisions would require the Archdiocese to either compromise its sincerely held religious beliefs or refrain from serving children in the foster-care system." *Azar*, 476 F. Supp. at 573.

irreparable harm of nonrecoverable compliance costs[.]") (emphasis in original) (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)).

136.    Indeed, Texas warrants special solicitude in the standing inquiry. "States are not normal litigants for the purposes of invoking federal jurisdiction," they may be entitled to "special solicitude"—a doctrine that allows a state to establish standing "without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 520 (2007). Under this special solicitude standard, a state will establish standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518.

137.    Specifically, "[s]pecial solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Texas v. Biden (MPP)*, 20 F.4th 928, 969 (5th Cir. 2021), *rev'd on other grounds,* 142 S. Ct. 2528 (2022) (citing *Massachusetts*, 549 U.S. at 516–20).

138.    Here, Texas has established a procedural right to challenge the SOGI Rule and the Becerra Actions under the APA because it has suffered a legal wrong and been adversely affected or aggrieved by challenged actions. *See* 5 U.S.C. § 702.

139.    Texas also satisfies the second element of special solicitude because the SOGI Rule and the Becerra Actions affect the quasi-sovereign interests of Texas.

140.    A "quasi-sovereign interest" is "a judicial construct that does not lend itself to a simple or exact definition." *Texas v. United States ("DACA")*, 50 F.4th 498, 514 (5th Cir. 2022) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 601 (1982)). While

"sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party" are not considered quasi-sovereign interests, there are several interests that do satisfy that definition, including the "set of interests that the State has in the well-being of its populace"; the State's interest in "the health and well-being—both physical and economic—of its residents"; and the State's interest in "not being discriminatorily denied its rightful status in the federal system." *Id.* (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 602, 607). "'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *Id.* at 515 (quoting *Massachusetts*, 549 U.S. at 519).

141.    Quasi-sovereign interests are present in this case. Through its sovereign lawmaking powers, Texas has taken steps to ensure it can contract with many different child placing agencies which hold varying views on religion, sexual orientation, gender identity, and same-sex marriage status. DFPS works with both secular and faith-based organizations to find loving homes for children. Indeed, H.B. 3859 addresses Texas's quasi-sovereign interests by ensuring that more child welfare service providers, including child placing agencies, can operate in Texas.

142.    H.B. 3859 also furthers the bests interests of Texas's foster children because it ensures that those individuals who do not want to, or cannot, work with religious child placing agencies have other options. This is because "[a] child welfare services provider who declines to provide a child welfare service as authorized by" H.B. 3859 is obligated to provide the person seeking the service with information about other service providers. Tex. Hum. Res. Code § 45.005(c).

143.    But because Texas's current legal code is at odds with the SOGI Rule and the Becerra Actions, it now faces the threat of federal preemption, representing another injury imposed by those actions. Accordingly, Texas satisfied both elements of special solicitude.

## V.    CLAIMS

### COUNT I
### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law

144.    Plaintiff incorporates by reference all other paragraphs.

145.    The Becerra Actions are not in accordance with law because they contradict and undermine the statutes governing Title IV-E funding.

146.    By passing statutory anti-discrimination requirements applicable to Title IV-E funding, Congress carefully considered and adopted the protections it deemed necessary and appropriate in this context.  Congress did not leave this issue open to regulatory amendment, nor create a gap for HHS to fill.  HHS does not have discretion to impose additional anti-discrimination requirements, like the Becerra Actions—and no statute authorizes the Becerra Actions to impose such additional anti-discrimination requirements.

147.    Moreover, exposing Texas to the costs and risks of enforcement and the withholding of Title IV-E funds based on the Becerra Actions would be inconsistent with the statutes requiring HHS to make Title IV-E payments to States with approved plans.

148.    Congress gave the Secretary a mandatory duty to approve plans that comply with the statutory criteria, including the statutory anti-discrimination requirements.

149.     Congress gave the Secretary a mandatory duty to make payments to States with approved plans.

150.     For HHS to withhold Title IV-E funding and subject Texas to the costs and risks of enforcement for reasons not grounded in a federal statute—including for failure to comply with the Becerra Actions—would violate Title IV-E. In that situation, the Secretary would have violated his mandatory duties.

151.     Plaintiff has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

152.     Plaintiff has no adequate remedy at law.

153.     Absent injunctive, declaratory, and vacation relief against the Becerra Actions, Plaintiff has been and will continue to be harmed.

## COUNT II
### Violation of the Administrative Procedure Act
### Failure to Follow Notice-and-Comment Rulemaking

154.     Plaintiff incorporates by reference all other paragraphs.

155.     The Becerra Actions—individually and collectively—constitute final agency action reviewable under the APA. *See* 5 U.S.C. § 701(a).

156.     The Becerra Actions are a substantive or legislative rule that required notice-and-comment rulemaking. *See* 5 U.S.C. § 553. They are not exempt from the APA's notice-and-comment requirements as an interpretive rule, a general statement of policy, or a rule of agency organization, procedure, or practice. *See id.* § 553(b)(A).

157.    The Becerra Actions constitute a substantive rule because they affect eligibility for federal funding. *See Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C. Cir. 1982) (holding a rule affecting the process home health agencies used to secure Medicare reimbursement was substantive, not procedural). They "change[] the substantive standards by which the [agency] evaluates applications which seek a benefit that the agency has the power to provide." *DAPA*, 809 F.3d at 176–77; *see also DACA*, 50 F.4th at 524; *Texas v. United States*, 328 F. Supp. 3d 662, 729 (S.D. Tex. 2018); *La Union del Pueblo Entero v. FEMA*, 141 F. Supp. 3d 681, 710 (S.D. Tex. 2015).

158.    The Becerra Actions constitute a substantive rule because they "encode[] a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987).

159.    Because HHS did not use notice-and-comment procedures, the Becerra Actions are invalid. *See* 5 U.S.C. § 706.

### COUNT III
### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law

160.    Plaintiff incorporates by reference all other paragraphs.

161.    The SOGI Rule is not in accordance with law because it contradicts and undermines the statutes governing Title IV-E funding.

162.    By passing statutory anti-discrimination requirements applicable to Title IV-E funding, Congress carefully considered and adopted the protections it deemed necessary and appropriate in this context.  Congress did not leave this issue open to regulatory amendment,

nor create a gap for HHS to fill.  HHS does not have discretion to impose additional anti-discrimination requirements, like the SOGI Rule, through regulation under the Housekeeping Statute—and any other statute could not authorize the SOGI Rule. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

163.    The SOGI Rule contradicts and undermines Title IV-E by deviating from the anti-discrimination requirements found in the statute and by changing the way anti-discrimination requirements are enforced, regardless of whether they are found in the statute.

164.    Moreover, withholding Title IV-E funds based on the SOGI Rule would be inconsistent with the statutes requiring Defendants to make Title IV-E payments to States with approved plans.

165.    Congress gave the Secretary a mandatory duty to approve plans that comply with the statutory criteria, including the statutory anti-discrimination requirements.

166.    Congress gave the Secretary a mandatory duty to make payments to States with approved plans.

167.    For HHS to withhold Title IV-E funding for reasons not grounded in a federal statute—including for failure to comply with the SOGI Rule—would violate Title IV-E. In that situation, the Secretary would have violated his mandatory duties.

168.    Even if the general housekeeping statute otherwise authorized the promulgation of regulations like the SOGI Rule, it does not do so here because that would override the specific statutory framework provided in Title IV-E.  *See Schism v. United States*, 316 F.3d 1259,

1280 (Fed. Cir. 2002) ("A reasonable lawyer advising the Secretary of Defense or any of the service secretaries at the time could not have claimed that § 301 created the right to make promises of lifetime health care (beyond space available care) because there were other statutes controlling retiree care at the time.").

169.    Plaintiff has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

170.    Plaintiff has no adequate remedy at law.

171.    Absent injunctive, declaratory, and vacation relief against the SOGI Rule, Plaintiff has been and will continue to be harmed.

### COUNT IV
### Violation of the Administrative Procedure Act
### Agency Action in Excess of Statutory Authority and Limitations

172.    Plaintiff incorporates by reference all other paragraphs.

173.    The SOGI Rule is not in accordance with law because it exceeds HHS's power under the Housekeeping Statute.

174.    "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

175.    HHS asserted only one statutory basis for the SOGI Rule: the Housekeeping Statute, 5 U.S.C. § 301. *See* 81 Fed. Reg. 89,395.

176.    But that provision did not authorize HHS to promulgate the SOGI Rule.

177.    The Housekeeping Statute is "simply a grant of authority to the agency to regulate its own affairs." *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979). "It is indeed a 'housekeeping statute,' authorizing what the APA terms 'rules of agency organization[,] procedure[,] or practice' as opposed to 'substantive rules.'" *Id.* at 310 (quoting 5 U.S.C. § 553).

178.    The SOGI Rule is a substantive rule because it "affect[s] individual rights and obligations." *Id.* at 302 (quotation omitted). By conditioning grant funding on compliance with the SOGI Rule, HHS promulgated a rule in which "the rights of individuals are affected." *Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711–12 (D.C. Cir. 1985) (quotation omitted) (holding that the rights of individuals are affected by "procedures for treatment of applications for grants under the Urban Crime Prevention Program").

179.    Under "the substantial impact test," the SOGI Rule is substantive because it requires Texas to choose between losing significant federal funding and changing its foster care policy. *DAPA*, 809 F.3d at 176 (holding that DAPA was substantive because it "force[d] the state to choose between spending millions of dollars to subsidize driver's licenses and changing its law"); *Texas v. United States*, 787 F.3d 733, 765–66 (5th Cir. 2015) (same).

180.    The SOGI Rule is a substantive rule because it affects eligibility for federal funding. *See Schweiker*, 690 F.2d at 949 (holding a rule affecting the process home health agencies used to secure Medicare reimbursement was substantive, not procedural). It "change[s] the *substantive standards* by which the [agency] evaluates applications which seek a benefit that the agency has the power to provide." *DAPA,* 809 F.3d at 176–77; *see also DACA*, 50 F.4th at 524; *Texas*, 328 F. Supp. 3d at 729; *La Union del Pueblo Enter,* 141 F. Supp. 3d at, 710.

44

181.    The SOGI Rule is a substantive rule because it "encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior." *Am. Hosp. Ass'n*, 834 F.2d at 1047.

182.    HHS promulgated the SOGI Rule through notice-and-comment rulemaking, which is required for a substantive rule but not for "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b).

183.    Moreover, the major policy change HHS seeks to implement through the SOGI Rule is not one that Congress authorized to be advanced through the Housekeeping Statute. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  In light of the significant policy debates concerning issues addressed in the SOGI Rule, it is particularly implausible to say Congress authorized HHS to control States' policies regarding those issues in the Housekeeping Statute. *See Gonzales v. Oregon*,  546 U.S. 243, 267 (2006) ("The importance of the issue of physician-assisted suicide, which has been the subject of an 'earnest and profound debate' across the country, makes the oblique form of the claimed delegation all the more suspect.").  In passing the Housekeeping Statute, Congress did not authorize the SOGI Rule.

184.    The SOGI Rule implicates major questions that Congress would not—and did not—delegate to HHS in the Housekeeping Statute.  Under the major-questions doctrine, the Court should not "conclud[e] that Congress … intended such an implicit delegation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). The doctrine provides that when an agency seeks to resolve a major question, a "merely plausible textual basis for the agency action" is not enough. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). "The agency instead

must point to 'clear congressional authorization' for the power it claims." *Id.* (quoting *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). HHS cannot do so here.

185.    Plaintiff has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

186.    Plaintiff has no adequate remedy at law.

187.    Absent injunctive, declaratory, and vacation relief against the SOGI Rule, Plaintiff has been and will continue to be harmed.

### COUNT V
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action

188.    Plaintiff incorporates by reference all other paragraphs.

189.    The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

190.    HHS declined to extend the SOGI Rule to Title IV-A funding because "[t]he TANF statute, 42 U.S.C. § 608(d), already identifies the nondiscrimination provisions that can be applied to TANF." 81 Fed. Reg. 45,271. Because Title IV-A's anti-discrimination requirement and the SOGI Rule differ in scope, 42 U.S.C. § 608(d), HHS concluded the SOGI Rule should not apply to Title IV-A funding. 81 Fed. Reg. 45,271. *See also* 45 C.F.R. § 75.101(f) ("Section 75.300(c) does not apply to the Temporary Assistance for Needy Families Program (title IV-A of the Social Security Act, 42 U.S.C. § 601–619).").

191.    HHS's only explanation for not extending the SOGI Rule to Title IV-A funding applies equally to Title IV-E funding. Like Title IV-A, Title IV-E contains express anti-

discrimination provisions.  And like the Title IV-A provisions, the Title IV-E provisions do not cover religion, sexual orientation, gender identity, or same-sex marriage status.

192.    But HHS failed to apply the same logic to Title IV-E funding.

193.    HHS did not provide any reason for treating Title IV-E funding differently from Title IV-A funding. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Commc'n of the United Church of Christ v. FCC,* 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

194.    Such "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018).  HHS's action is "paradoxical" in a way that "signals arbitrary and capricious agency action." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019).

195.    Even if there were some avenue to explain or justify HHS's apparent inconsistency, it would be irrelevant because the agency did not provide any such explanation or justification in the Federal Register.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

196.    Plaintiff has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

197.    Plaintiff has no adequate remedy at law.

198.    Absent injunctive, declaratory, and vacation relief against the SOGI Rule, Plaintiff has been and will continue to be harmed.

## COUNT VI
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action

199.    Plaintiff incorporates by reference all other paragraphs.

200.    The SOGI Rule is arbitrary and capricious because HHS failed to account for important considerations before adopting it. *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'").

201.    HHS's consideration of the SOGI Rule was cursory. It did not analyze factors relevant to the policy decision it was making.

202.    Remarkably, HHS did not consider whether the SOGI Rule would be good or bad for children in foster care. It did not analyze whether the SOGI Rule would decrease the quantity or quality of child placing agencies by driving away non-compliant organizations. *See* 81 Fed. Reg. 89,393; 81 Fed. Reg. 45,270.

203.    HHS itself acknowledges that its foster care program is designed "to provide safe and stable out-of-home care for children."[40] At all points during the foster care process,

---

[40]    HHS Children's Bureau, Title IV-E Foster Care (May 17, 2012), available at https://www.acf.hhs.gov/cb/grant-funding/title-iv-e-foster-care (last visited May 12, 2023).

decisions are supposed to be made based on the child's welfare. *See, e.g.*, 42 U.S.C. § 672(a)(2)(A)(ii) (requiring "the removal and foster care placement" to be "in accordance with … a judicial determination to the effect that continuation in the home from which [the child was] removed would be contrary to the welfare of the child"); 45 C.F.R. § 1355.25(a) ("The safety and well-being of children and of all family members is paramount.").

204.    A rule governing foster care that fails to consider the best interests of children in foster care is not the result of "reasoned decisionmaking." *Michigan*, 135 S. Ct. at 2706.

205.    HHS also did not consider the religious-liberty interests of individuals and organizations who serve foster children. *See* 81 Fed. Reg. 89,393; 81 Fed. Reg. 45,270. Religious liberty is vitally important, both under federal and state law.  Indeed, HHS itself has been charged with enforcing statutory protections for religious liberty.[41]  In this context, HHS's failure to even consider religious liberty as a factor means it did not engage in "reasoned decisionmaking." *Michigan*, 135 S. Ct. at 2706.

206.    For these and other reasons, it should have been obvious to HHS that the SOGI Rule would be controversial.  But HHS professed a belief that it would be "non-controversial." 81 Fed. Reg. 45,271.  That reflects a lack of serious consideration by HHS.

## DEMAND FOR RELIEF

Wherefore, Plaintiff respectfully requests the Court:

    a.    Declare that the Becerra Actions—the IM, the Program Instruction, and the Advancing Equity Directive—are invalid under the Administrative Procedure Act;

---

[41]HHS Office of Civil Rights, Laws and Regulations Enforced by OCR, https://www.hhs.gov/civil-rights/for-providers/laws-regulations-guidance/laws/index.html (last visited May 12, 2023).

b.   Declare that the SOGI Rule is invalid under the Administrative Procedure Act;

c.   Hold unlawful and set aside, *i.e., vacate*, the SOGI Rule and the Becerra Actions (the IM, the Program Instruction, and the Advancing Equity Directive);

d.   Issue permanent injunctive relief enjoining Defendants from enforcing the SOGI Rule and the Becerra Actions (the IM, the Program Instruction, and the Advancing Equity Directive);

e.   Award such other and further relief as it deems equitable and just.

Dated: May 12, 2023                              Respectfully submitted,

KEN PAXTON                                       LEIF A. OLSON
Attorney General of Texas                        Chief, Special Litigation Division

BRENT WEBSTER                                    */s/ Ryan D. Walters*
First Assistant Attorney General                 RYAN D. WALTERS, *Attorney-in-Charge*
                                                 Deputy Chief, Special Litigation Division
                                                 Texas Bar No. 3369185

                                                 ETHAN SZUMANSKI
                                                 Assistant Attorney General
                                                 S.D. Tex. No. 3836010

                                                 OFFICE OF THE ATTORNEY GENERAL
                                                 P.O. Box 12548 (MC-009)
                                                 Austin, Texas 78711-2548
                                                 Tel.: (512) 936-2714
                                                 Fax: (512) 457-4410
                                                 ryan.walters@oag.texas.gov

                                                 *Counsel for Plaintiff State of Texas*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on May 12, 2023.

                                                 */s/ Ryan D. Walters*
                                                 RYAN D. WALTERS